Our next case is number 2010-1081 ACACIA MEDIA TECH v. MEDIACOM The District Court committed a reversible error in this case when it found that the claim terms, identification decoder, and sequence decoder were indefinite. Although indefiniteness is an issue of law, that legal determination is peculiarly fact-based. And what we need to do is we need to examine the intrinsic patent documents from the perspective of what one abortionist's skill in the art would understand them to mean. And the judge had to have been curious that these two terms were insolubly indefinite. Is my recollection correct? I seem to remember that both sides agreed there was no plain and ordinary meaning for either of those two terms. Is that right? I believe that's correct. Well, there's no plain and ordinary meaning, and if the words sequence encoder appear nowhere in the spec, where does that leave us? How are we supposed to figure out what it means? Well, Your Honor, the identification encoder is described in... No, sequence. I want you to start with sequence. Identification encoder certainly does identification in the spec, but sequence encoder, it has no plain and ordinary meaning, and those words do not appear anywhere in the spec, so how do we figure out what it means? We figure out what it means exactly how we figure out how any term means with respect to any claim term, and that is by looking at what the specification teaches in the context of what this invention is, and the bank court case of the Federal Circuit was also a circumstance where there was no plain meaning of the phrase, and the phrase, the claim term itself was not used in the specification either, and in that case, the court, because of what was disclosed, in fact, determined that it was not indefinite, and what we have here is when you read the specification, the term sequence encoder, and the sequence, creating a sequence of addressable data blocks, maps precisely to what the specification requires or describes the time encoder to do, and what that time encoder, it does is two different things. Basically, it time marks specifically every frame of video and every sample of audio, so that within this transmission system, it can be realigned and synchronized, and additionally, it creates blocks, data blocks that are addressable through the use of time encoding, and the first... But the specification discloses other types of sequences, like pictures, books, and even musical instruments. What relevance would a time encoder have for those things? Well, what happens is those are described, those physical objects are described in the source material library. There is nothing that prevents time encoding from being used, not only for digital information, but also for physical information. What occurs here is this, and this is if I can get to their centerpiece indefiniteness argument that is relevant to this issue about physical items in the source material library, is that their principle indefiniteness argument with respect to identification encoder is the following, is that when you look at the specification, it talks about source material library... We're now to identification encoder. Well, but yes, we are, but we're talking, what I'm doing is I'm just... The problem there is that there seem to be a number of different functions described in the specification. It's not clear which functions are performed by the identification encoder. I don't think that's true, Your Honor. Tell me why that's wrong. Well, with respect to specifically, there is the identification encoder receives information from the source material. What in your view are the functions that are performed by the identification encoder? They are listed. The functions of identification encoder are in fact listed in the 992 patent, which are common specifications, column six, lines 39 through 47, which identify the mandatory function as receiving information in some media format from the source material library and assigning a unique identification code to it. That's the mandatory function. And the optional functions described there is the provision of details about the item, which the patent describes as program notes, and also the insertion also of additional popularity code information. Those are the functions identified within that portion of the patent. Importantly, the district court had no problem discerning the meaning of identification code in its first marking order when it's described as a structure that assigns a unique identification code. But you're saying it's not limited to that. No, but what happens is from the standpoint of claimant... Wait, you can't talk over me. Sorry. You are not saying it's limited to that, right? I am not saying that it's limited to a mandatory function. That's correct. Well, what functions are you saying are mandatory for the identification code? Only one. What's that? The assigning a unique identification code to every item of information. Not receiving information? That's simply the input. Well, that's a function, isn't it? No. In a software patent, in a signal processing patent, there are inputs, there are functions, and there are outputs. And what... Although in the summary of invention, it is described in the summary of invention, it talks about identification encoder retrieving items from the source material library and assigning a unique identification code. It's simply... That is really the... That retrieving is simply the input where it comes from. And what occurs here in every respect, and I'm prepared to talk about this to address their principle indefinite in this argument, is that before information leaves the source material library, it is in a data media format of either analog or digital. So, I believe it fairly read that's an input. It's not a function. And the sole mandatory function is assigning a unique identification code so that, again, the purpose of this whole invention is that someone can order a particular program and it's identified. Okay. Well, let's hypothetically suppose that we reject that. We find that identification encoder is insolubly ambiguous. Okay. You still have the argument about whether a transmission system necessarily includes an identification encoder, right? Yes. Okay. Could you address that one? Yes. What happens is that transmission system ought not, in this case, have the specialized meaning that the court applied to it. It has an ordinary meaning of an assembly element to transmit. And let me tell you exactly why the trial court's specialized construction is legally incorrect and that it is not limited to the transmission system 100 depicted in figures 2A and 2B of the patent, which is the single block diagram, which extends over two pages. We know this because the patent says so, and I call your attention to column five, lines 59 through 65, where the patent expressly says that figures 2A and 2B illustrate multiple implementations, not one, uses the plural, of the transmission system. It then confirms this by stating, quote, a preferred embodiment of the transmission system 100 may preferably include only some of the elements shown in figures 2A, 2B. But there's no language in the specification that says an identification encoder is one of those preferably items, right? No. There is no such language. An identification encoder is preferably part of the transmission system. You just pointed out the various parts of the specification which refer to various things as preferably included, and you say, well, if they're preferably included, that means they can be left out, right? That's your argument. Correct. Okay. What I'm asking you is, does that preferably language appear anywhere in the specification referring to what, in your view, is the optional nature of the identification encoder? I don't recall it preferably applies to everyone. Counsel, if you can look at that one, I don't recall that. Well, anyway, you're not right now able to point to any place where it uses that language. I'm not at this moment. Right. Okay. But it does. What about the language in Column 6 that talks about prior to being made accessible to a user of the transmission and risk-feeding system must be stored in a compressed data library and given a unique identification code? Why doesn't that language suggest that an identification encoder is necessarily part of every transmission system? Can you point me to the line? Yeah. It's line 35 in Column 6. I'm sorry. Your question? The question is, doesn't that suggest that a transmission system necessarily includes a unique identification encoder? Yes. This patented system will not work unless each item of information such as a program is given a unique identification code. So I believe it's correct that the process of assigning unique identification codes, which is described as a step in method claims, and an identification encoder, which is described in the system claims, is a necessary part of this invention. Whether it's mentioned preferably or not, it's a necessary part. Well, why doesn't that mean that the identification encoder is a necessary part? Well, it's a necessary part, the identification encoder, provided that it is construed to have the, correctly construed to have the functions we're talking about with respect to assigning a mandatory, the mandatory function of assigning a code. It has to be there. It doesn't have to be there in the method claims because that structure is not in any method claim. All you have to have in the method claims is a transmission system that performs that step, whether it's done by any particular structure named in the method claims. Well, but it pretty much has to be done by an identification encoder, doesn't it? I mean, what other structure? Certainly. Certainly. But I'm just saying from the standpoint of when we're talking about, if we're being careful legally about indefiniteness, we can only focus on language and claims that are indefinite and the phrase identification encoder does not appear in the method claims we're talking about. Do we have to give transmission systems plain and ordinary meaning in order for you to prevail? Well, what has happened is, where we stand now, when you say in order for me to prevail on this appeal, you cannot, in order for the appellant to prevail on this appeal, you have to give transmission system a meaning other than transmission system 100 containing each and every element of figure 2A and 2B, which is what the district court said, and also where he's found because identification encoder is an element there, that therefore because that's he contends, the court contends is indefinite, that would therefore make every transmission claim indefinite. I guess if your transmission system as defined in your claims always includes the step of generating a unique identification code, which it always does, it either includes an identification encoder outright or in the method claims the step of generating the unique identification code, and the only thing in the spec that generates the unique identification code is the identification encoder, right? Yes. But that's in theory this black box. There's no structure anywhere in the spec that tells us what identification encoder is. Let's talk about this structure concept for a minute. An encoder is mentioned, but we're talking about signal processing patents. We're talking about a software patent, and what Mr. Weiss, our expert, in painstaking detail in 72 pages starting at appendix 7590 explains, and interestingly, what their expert agreed with is that where you're talking about a software signal processing patent, once you know the input, once you know the function, once you know the output, you know everything you need to know to know what it is and know how to build it, and it's undisputed with respect to that, and this patent discloses all that. Well, haven't we held in WMS Gaming and other cases that for validity purposes a software patent, which is how you characterize this, I'm not sure I would characterize this as a software patent, but you do, and so that's why we'll adopt that characterization for this purpose, but haven't those cases held that at least an algorithm is necessary, perhaps not code, but at least an algorithm, something is necessary to give that sense of definiteness to a claim? I believe I said this is a signal processing software patent, and obviously there is hardware associated with this, but what you have is your... But neither the hardware for the identification encoder nor an algorithm to explain how the software components of it would work, neither of them are present anywhere in this specification. What this specifically describes is when you're talking about, if you for example... Am I wrong? Correct me first, because if I'm wrong I want to know, is there... There's no algorithm disclosed. And there's no structure either. There's structure in the sense that an encoder is disclosed, and that encoder... Give me examples of what kind of encoder could perform this. It's just as an identification encoder is disclosed in the patent that then the inputs, function, and outputs are described in the patent. One, a skill in the art understands how to build this, understands what this is. I mean, I ask you to read the declaration of Mr. Weiss because he tethers his testimony to two things, what is disclosed in this patent and what existed at the time and what in fact someone who raised skill in the art knew at the time. Okay. Your time has expired. We'll give you your two minutes. Thank you. Mr. Ben-Yakar, am I pronouncing that one right? Ben-Yakar, yes. Thank you. May it please the court, as the district court found, it is undisputed that identification encoder does not have a plain meaning. It's undisputed that you could not buy one off the shelf, that it was not a known structure, and yet the specification does not explain what one is. It doesn't disclose the structure for one, and it does not even provide a comprehensible or consistent description of what the identification encoder is supposed to do, and that's why after holding numerous hearings, considering numerous briefs, giving a case the opportunity to conduct an evidentiary hearing. If the specification merely said an identification encoder assigns a unique ID code and that was it. It just said, you know, it performs no other functions. If that's what the specification said, would we still have this indefiniteness problem? In this case, you would because the system does not work if that's all the identification encoder does. So, for example, Mr. Dorman says, well, the specification says that assigning an identification code is the only must, that everything else is optional. Well, that's not true. Column 1 and Column 2 set forth a number of objects of the invention, after which, in the summary of the invention, the applicant says... Yes, but not every object of the invention needs to be performed by every claim, and if we're talking about whether we select claim 1 of the 702 patent, which is the transmission system, which has a sequence encoder, an identification encoder, blah, blah, blah, it goes all the way through. If identification encoder, if the spec really did say this is simply a structure that assigns a unique identification code, it could be a random number generator, for example, I wouldn't be here with this indefiniteness problem, would we? If the specification defined identification encoder to say it assigns an identification code and does nothing else, and I'm being my own lexicographer and defining it that way, then you would construe it that way, but the patent would have a host of other problems. Written description enabling... No, I understand, but the only one in front of us today is indefiniteness. Yes, but I just want to be clear, Your Honor, the specification directly does not say that. I know. The specification says that at least in column 2. In order to achieve all of the objects of the invention under the summary of the invention, you have an identification encoder that performs two functions. Retrieval function... The specification doesn't say it, but what about the method claims themselves, like method claim 41 of the 992 patent, which is a method of transmitting information performed by a unique identification code to the retrieved information? Why does that method claim necessarily incorporate an identification encoder as opposed, you know, with all those other functions disclosed in the spec, as opposed to, since it doesn't use the word identification encoder, simply some structure capable of performing that function? There are several reasons why, Your Honor. The first reason why is the passage that Judge Steiger referred to a few moments ago. The very must language that Acacia relies on to say assigning an identification code is a must says that identification code must be assigned by identification encoder 112. So that's a must in the specification. Whatever else the transmission system... So show me that exact language that you want me to focus on. Okay. This is at... Column 6, I think, is that what you're... Yes. Okay. It's column 6, line 35. Column 6, line 35. Prior to being made accessible to a user of the transmission and receiving system of the present invention, the item must, and that's the must Acacia relies on, be stored in at least one compressed data library 118 and given a unique identification code by identification encoder 112. Now, if Acacia relies on that must language for assigning identification code as a must, well, this language says that that code must be assigned by identification encoder 112. And that's not the only reason that it's required in that method claim, Your Honor. When claim 41 that Your Honor pointed to was first filed, it was identical in every respect to claim 41 as issued, with one exception. It did not require that the steps be formed by a transmission system. And that claim was rejected over the priority. And the applicants came back and amended the claim in one way. They added that the steps had to be performed by a transmission system. And then they distinguished the priority by saying, now I've got a bunch of steps that are performed by the components of figure 2, and they specifically call out the identification encoder. So not only is it a must in the specification, that's what the applicants told the patent for statement. So for those reasons, I just want to be clear that district court held that identification encoder invalidated every asserted claim because every claim requires a transmission system. And transmission system means figure 2, and figure 2 has an identification encoder. But in response to the court's questions to Mr. Dorman, that is not the only reason that identification encoder invalidates all the claims. We have the must language in the prosecution history. All the apparatus claims expressly require an identification code. The method claims require assigning identification code by a transmission system. It's in all the claims, irrespective of the court's destruction of transmission system. Now, I'd like to take a minute and go back to why identification encoder is indefinite. Not only do the claims expressly require an identification encoder, but the most fundamental objective of that identification encoder is to retrieve from the source material library. Now, source material libraries described in the specification is only this collection of physical objects, books, musical instruments, still pictures, and the like. And Acacia convincingly, persuasively convinced the district court that that's all it was, that source material library does not have a plain meaning, they said. That's all the specification says about it, and so you can construe it to be no more than that. And all the other problems, they said, rested on the identification encoders. It was the identification encoder's job to get the things out and to take the information off the physical objects. Well, the whole object of this invention is you start with that source material library, you extract the information from the objects in it, you process that information through the components of the transmission system, and you ultimately transmit the information to the user. Well, if the identification encoder does not perform that retrieval function, it's the only component in the patent that's assigned with retrieval, then the physical objects just sit there. There's nothing for the identification code to sign an identification code to. There's nothing to send to the user. The transmission system just sits there and does absolutely nothing. And we point this out in our brief, and Acacia has no response to this. Obviously, in view of the specification, retrieval is a mandatory function. And for those reasons, Acacia's expert, Mr. Weiss, that Mr. Dorman just referred to, when asked at the evidentiary hearing about the very construction that Acacia offers here, said, no, that's not right. Identification encoder would have to perform all of the functions ascribed to it in the patent, which left Acacia in the unenviable position of then trying to convince the district court to ignore its own expert. So retrieval and the other functions of the identification encoder in the patent are a must, just as assigning an identification code is a must. Now, unfortunately, it's not possible to adopt Mr. Weiss's methodology of just including all the functions in the construction, because the specification does not even coherently describe what those functions are. As we describe in our specification, we know that the identification encoder is supposed to retrieve from the source material library, but it's repeatedly and directly contradictory as to what that retrieval entails. And we lay out all sites in our briefs. The most stark example is Figure 7, which is set out to be the preferred method of using the transmission system to respond to user requests. And the method starts with a statement. This method assumes that all the information is in the compressed data library. And then the very next sentence is, you retrieve from the source material library based on a user request. And then later in the method, when it gets to the compressed data library, it then says, now wait for a user request. There's absolutely no way to resolve the insoluble ambiguity, even with respect to what retrieval is supposed to entail. And similar problems with the identification encoder is what led the district court, after innumerable hearings and briefings and an evidentiary hearing, to hold that identification encoder is indefinite. And for the reasons we already discussed, that renders all of the assertive claims indefinite. Now, I would just like to spend a moment on the sequence encoder, Your Honor, because you brought that up. There is no dispute that sequence encoder does not have a plain name. And there's also no dispute that it's not used in the specification. And their expert, Acacia's expert, Mr. Weiss, admitted that outside of the context of claim construction, I would assume sequence encoder was brought on time encoder. That time encoder encodes according to time, and a sequence encoder can encode otherwise. His sole basis, Mr. Weiss's sole basis for saying sequence encoder equals time encoder, is a statement that, well, that's all that's disclosed. So, in effect, we've disclosed only a species, but we claim the genus, so therefore the genus must mean the species. That is just not a claim construction principle. And I would suggest it's wrong for that reason. In addition, though, as we pointed out in our brief, even time encoder is indefinite because, Judge Moore, as you pointed out, the patent says books, musical instruments, and still pictures in the library, in the source material library, and time just does not apply to them. Now, Acacia says, well, in their briefs they say, well, the patent just teaches that you time encode these things, but I've got a picture of my kids in my wallet. If I pull it out and tell my colleague the time encoder, I suggest that they would not know what to do. And so just, even if what they said is right, and the patent says, well, you time encode the picture, that is not a sufficient description of the function to even know what that device is supposed to do. Finally, on transmission system, as I said, the court need not reach the destruction of transmission system to affirm the judgment below, but there was no dispute below that the use of the term transmission system in the specification of this… How do we affirm the judgment without reaching the construction of transmission system? Because the construction of transmission system requires all of the interconnected components of figure two, but because of the must language in the specification, and the fact that every claim requires either an identification… So they at least have to construe it to include an identification encoder. At least an identification encoder. And the method claims, because they require to assign an identification code with a transmission system, or the apprax claims which expressly require an identification code. So that's why the judgment can be affirmed, even if the court decides all of the components of figure two are not required. But in fact, all of the components of figure two are required, because the patentees used the term transmission system in a manner that was not compatible with its plain meaning, and as such, redefined it. Plain meaning transmission systems do not have books, musical instruments. They point to language that, the plain meaning dictionary, that says it's an assembly of components that transmits. But I would suggest that the papers that I have on the table here are not part of any assembly of components that do anything. But they are part of the patentee's transmission system. So the patentee redefined the term, and the only source the district court had to go on in terms of how to construe it was the specification. And as we pointed out in our briefs, over ten times in the specification, the patentee describes that transmission system, transmission system 100, as the invention itself. And there's only one transmission system disclosed. It's a linear set of components in which the output from one goes to the input of the other, and that transmission system 100 is the only transmission system disclosed, and based on that, the district court correctly concluded that transmission system meant the interconnected components of transmission system 100. Thank you. Thank you, Mr. Lindberg. Your Honor, three points. First, with respect to the reference that counsel made to Merrill Weiss' purportedly devastating admission in court that we were running away from, you can read it yourself in the appendix at 018642-44. He does not say what he said. What Merrill Weiss said was he was asked a different question. He wasn't asked what the claim term means. He was asked, everything that the spec talks about, would it be more than simply, would you understand identification code do more than simply that mandatory thing, and the answer to that was yes, and that is our position. It is yes. The second point, with respect to the issue about the retrieving function of the identification encoder, there are three, four references that I ask you to focus on in the spec. The patent doesn't say the identification encoder retrieves physical items. It says it retrieves information from the items as expressed in the summary at two lines, 31 through 34. But then, and this is what's important, because there's no mechanical activity associated with any identification encoder. The patent clearly discloses that the input to the identification encoder is data described as media in digital or analog form, not physical objects. That's at column six, lines 62 through 64, where it says the items stored in the source material library, 111, and encoded by identification encoder 112 may be in either analog or digital form. And earlier, at column six, lines 52 through 54, it says, quote, the identification encoding process is identical for any of the media types stored in the source material library. And here's what's awfully important about the physical items, the mechanical retrieval notion. The patent teaches that with respect to physical items in the source material library, they are, quote, and this occurs in the source material library, converted to or recorded on a media format compatible to the digital and analog inputs of the system. That's at column six, lines 15 through 19. Okay. I think you're out of time now, Mr. Dorman. Thank you very much. Thank you, Mark.